IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2016 Session

**STATE OF TENNESSEE v. TERRY BUTLER**

**Appeal from the Criminal Court for Shelby County**
**No. 13-05121    James M. Lammey, Jr., Judge**

————————————————

**No.  W2015-00707-CCA-R3-CD  -  Filed June 6, 2016**

————————————————

The Defendant, Terry Butler, was convicted by a Shelby County Criminal Court jury of tampering with evidence, a Class C felony, three counts of official misconduct, a Class E felony, and two counts of official oppression, a Class E felony.  *See* T.C.A. §§ 39-16-503 (2014) (evidence tampering), 39-16-402 (2014) (official misconduct), 39-16-403 (2014) (official oppression).  The trial court merged the three counts of official misconduct and sentenced the Defendant to an effective four years to be served on five years' probation. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the indictment for Count 3, official misconduct, was defective, and (3) the trial court erred in denying judicial diversion.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J. joined.

Joseph A. McClusky and Joseph Massey (on appeal), Leslie Ballin (at trial), Memphis, Tennessee, for the appellant, Terry Butler.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Jessica Banti and Rachel Russell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from an incident in which the Defendant, a police officer, delivered false information to his girlfriend and prompted her to give the information to the police investigating a burglary of her home and procured the unjustified arrest of two young men in connection with the burglary.

At the trial, Memphis Police Officer Devin Thompson testified that on July 8, 2013, he responded to a burglary call. He said that fingerprints were taken from the scene, that no suspects existed at the time, and that no DVD player was listed as stolen. On cross-examination, Officer Thompson testified that he spoke to the burglary victim, Jessica Green, that she identified several stolen electronic items, and that a DVD player was not included in the list.

Memphis Police Officer Jeremy Mackey testified that on July 10, 2013, he responded to Ms. Green's neighborhood to reports by the Defendant and Ms. Green that a prowler was stealing a ladder from a home. Officer Mackey said that he worked with the Defendant in the Memphis Police Department but was not previously acquainted with Ms. Green. He said that he and other officers searched a wooded area into which the Defendant and Ms. Green said two prowler suspects had gone. Officer Mackey stated that he and another officer found the ladder in the wooded area but that the suspects were not found. Officer Mackey stated that later in the day, the Defendant called Officer Mackey's personal cell phone and told Officer Mackey he saw two black men "walking down the street with possibly stolen items in their hands" and that the Defendant's location was close to the previous prowler call. Officer Mackey said that he obtained permission from Lieutenant Segrest to investigate, that Officer Mackey called the Defendant, and that the Defendant said he was following the men. Officer Mackey stated that he met the Defendant in a parking lot, that the Defendant had parked his truck and was walking toward two young men between ages sixteen and eighteen, and that Officer Mackey exited his police cruiser and told the men to come to him. Officer Mackey said he was in uniform. Officer Mackey stated that when he encountered the men, one of them was holding a plastic bag with a cord hanging from it. Officer Mackey said that the men came toward Officer Mackey, that Officer Mackey patted them down, told them why they were being stopped, and placed them in the rear of the police cruiser, and that the Defendant took a DVD player from them and placed it on the police cruiser's trunk.

Officer Mackey testified that he separated the men by leaving one of them in the police cruiser and having the other sit handcuffed on a sidewalk about ten or fifteen feet from the police cruiser. Officer Mackey said that one man told him the DVD player was his, that Officer Mackey spoke on the telephone to the man's mother, that she told Officer Mackey the man was not supposed to be pawning the DVD player, and that the man's mother began "badmouthing" her son to Officer Mackey. Officer Mackey stated that Lieutenant Segrest arrived, that the Defendant called Ms. Green in order to obtain the incident report number from her burglary, and that Lieutenant Segrest asked the Defendant to ask Ms. Green to come to the scene.

Officer Mackey testified that he saw the Defendant talking on his cell phone but did not hear the substance of the conversation. Officer Mackey said that he saw the Defendant lift up the DVD player on the police cruiser's trunk. Officer Mackey stated

that he viewed the burglary incident report and that he did not remember a DVD player listed among the missing items.

Officer Mackey testified that Ms. Green arrived at the scene and spoke to Lieutenant Segrest, that Ms. Green identified the DVD player as hers, and that when she was asked how she knew the DVD player belonged to her, she said, "Well, I know my property," but did not give further detail. Officer Mackey said that Lieutenant Segrest instructed him to hold the men until Lieutenant Segrest had contacted the felony response division, that after speaking to felony response, Lieutenant Segrest instructed Officer Mackey to add the men's information and the DVD player's recovery to the burglary report, and that the men were arrested and taken to the police station for questioning. Officer Mackey said that the men were "detained" and not free to leave but were not in police custody.

On cross-examination, Officer Mackey testified that he responded to the prowler call about noon, that Ms. Green told him about "activity going on" at the church across the street from her home, and that he determined the ladder had been taken from the church. Officer Mackey said that Ms. Green described the prowlers as two young, black men. He stated that when the Defendant called him, the Defendant thought the two men were involved with the theft of the ladder and possibly the burglary of Ms. Green's house and that the Defendant would "keep an eye on them." Officer Mackey said that the Defendant was in plain clothes and was driving his personal vehicle. Officer Mackey stated that he handcuffed and patted down the men, that he found no weapons on them, and that he detained them for further investigation pursuant to Lieutenant Segrest's instructions. Officer Mackey said that he asked the men about the DVD player and the ladder and that both denied involvement with the thefts. Officer Mackey stated that he asked the Defendant to call Ms. Green and to obtain the incident report number, that Officer Mackey noticed a DVD player was not listed as a stolen item in the report, and that Lieutenant Segrest requested Ms. Green come to the scene.

Officer Mackey testified that Ms. Green identified the DVD player as hers and that the Defendant repeated the DVD player was hers. Officer Mackey said that the Defendant did not know independently whether the DVD player belonged to Ms. Green. Officer Mackey did not remember what Ms. Green said when Lieutenant Segrest asked whether she had her DVD player's serial number. Officer Mackey said that Lieutenant Segrest took Ms. Green to the DVD player and that Ms. Green pointed at something on the DVD player. Officer Mackey did not know if Ms. Green showed Lieutenant Segrest a distinguishing mark on the DVD player.

On redirect examination, Officer Mackey testified that when the Defendant called him, Officer Mackey was not sure to which theft the Defendant referred and that the Defendant said he thought the men were responsible for a burglary. Officer Mackey stated that he detained the men for further investigation because the Defendant told him

they had possibly stolen property and "it was dealing with a burglary." Officer Mackey said that the men were charged with aggravated burglary. On recross-examination, Officer Mackey stated that the Defendant said the men were possibly involved in the burglary, that Ms. Green said the DVD player was hers, and that Officer Mackey arrested the men after Ms. Green identified the DVD player.

Memphis Police Lieutenant Aundra Segrest testified that on July 10, 2013, Officer Mackey called and told him "he possibly had two burglary suspects detained[.]" Lieutenant Segrest said that the source of Officer Mackey's information was a telephone call from an off-duty officer. When Lieutenant Segrest arrived, he said he spoke with Officer Mackey and the Defendant about the men, who were detained in a police cruiser. Lieutenant Segrest stated that other officers were present. Lieutenant Segrest said that the Defendant told him "that he called Mackey and told Mackey about the burglary suspects and that they were in a certain area . . . . He detained them, and he brought them there." Lieutenant Segrest stated that he told Officer Mackey to verify the burglary incident report and that Lieutenant Segrest looked at the report and saw a list of stolen items. Lieutenant Segrest said that he asked someone to get Ms. Green to the scene and that he interviewed her. Lieutenant Segrest stated that the Defendant said he knew Ms. Green "from the neighborhood" and did not mention having a personal relationship with Ms. Green.

Lieutenant Segrest testified that he spoke to Ms. Green privately and asked her what led her to believe the items belonged to her. He said that Ms. Green told him "a Magnavox" and remote control were taken from the house. He did not know whether the men's DVD player was Magnavox brand. He stated that Ms. Green told him "there might be some things that she might have missed that she needed to add to the report," that she identified the DVD player as hers, and that she did not have a serial number for the DVD player. He did not remember if Ms. Green indicated she had the serial number in another location. Lieutenant Segrest said that based upon the information he received from Ms. Green and the Defendant, he arrested the men.

On cross-examination, Lieutenant Segrest testified that he did not inquire as to the nature of the Defendant's relationship with Ms. Green. Lieutenant Segrest did not remember whether the Defendant identified the DVD player as belonging to Ms. Green. He said that he made the decision to arrest the men based upon Ms. Green's statement and the need to determine whether Ms. Green was mistaken in identifying the DVD player. Lieutenant Segrest stated that Ms. Green did not have a serial number for the DVD player when she identified it as hers. He said that he did not ask Ms. Green about any identifying marks on the DVD player.

Lieutenant Segrest testified that the Defendant may have said Ms. Green was a friend from the neighborhood. He later acknowledged that in a previous statement, he said the Defendant stated Ms. Green was a friend who lived in the neighborhood.

Jessica Green testified that in July 2013, she was in a romantic relationship with the Defendant and that she discovered her home had been burglarized. She noticed that her bedroom window was broken and that multiple televisions and computers were missing. She stated that she called family members, the Defendant, and the police. She gave the police a statement regarding the missing items but said she forgot to include or had not yet discovered all of the missing items. She stated that she did not include a DVD player in the initial report because she did not know it was missing at the time. She said that she attempted to add additional items to the police report, that the last copy of the report she received did not reflect the additional items, and that she did not know if the additional items were ever added.

Ms. Green testified that on the night she discovered the burglary, the Defendant told her he would help place boards over the broken window but that he did not come to her house. She said that she stayed in the house alone. Ms. Green stated that on July 10, 2013, the Defendant was at her house fixing the broken window. She said that she noticed work being performed on the church across the street from her house, that a man walked away from a ladder, that a second man emerged and attempted to pick up the ladder, that the second man returned with a third man, and that the second and third men carried away the ladder. Ms. Green said that she called the police and reported the men and that she called the Defendant's cell phone and told him she had reported the incident to the police. She said that she told the responding officers the men were black, in their twenties, had low or faded haircuts, and wore basketball shorts, white shirts, and tennis shoes.

Ms. Green testified that after the police left, the Defendant prepared to go to work and that he told Ms. Green he would check the area to see if he could find the two men because "he was kind of sure" they were the same people who broke into her house. She said that within five minutes of his departure, the Defendant called her and told her he found the men. She stated that in a second telephone call, the Defendant told her the police were on their way to him and that she would have to come to his location. She said that in a third telephone call, the Defendant dictated a serial number to her and told her, "This is your serial number for your stuff; write it down. If anybody asks you, don't tell them I gave it to you." She said he told her to give the number to the police. Ms. Green said that the Defendant told her he saw the men walking with a bag, that the Defendant stopped them, that the Defendant and the men argued, that the Defendant hit one of the men and showed them his gun, and that the Defendant told the men, "You all must not know about me out in these streets."

Ms. Green testified that the Defendant told her to "make [herself] presentable" and come to the scene, that he said he knew the items belonged to her and she needed to come look at them, and that the Defendant did not tell her what to say to the police. Ms. Green said that she did not generally keep serial numbers and that she did not give any serial numbers to the police in her initial report. She stated that when she arrived at the parking

lot, she spoke to Lieutenant Segrest and gave him a description of her DVD player. She said Lieutenant Segrest told her he needed more detail than the DVD player was black. She stated she looked at the recovered DVD player and said it looked like hers. She said that an officer asked if she recognized any marks or scratches on the DVD player and that she replied she did not.

Ms. Green testified that she briefly saw the men when she stood behind the police cruiser but that she did not see their faces. She said that the men did not look like the men she saw stealing the ladder because one man's hair was different. She stated that she mentioned the discrepancy to the Defendant but that the Defendant did not acknowledge her statement and said they were "the ones." Ms. Green said that she waited in the car and that the Defendant told her to meet with a person in felony response. She stated that she spoke to Sergeants Kent and Young, that she told them she did not have any serial numbers for her items, and that they told her to look for any serial numbers she might have at home. Ms. Green said that she did not give them the serial number the Defendant read to her because she did not feel it was the serial number for her DVD player. Ms. Green stated that she spoke to the Defendant after she went home and the Defendant told her, "[Y]ou need to give them that serial number. These n------ have done something to somebody, and they need to be in jail." She said that the Defendant told her the police needed the serial number to hold the men and that she returned to the police station to give the officers the serial number because she was afraid.

Ms. Green testified that when she arrived at the police station, the officers told her the suspects insisted someone called her from the scene and gave her a serial number and that the officers asked Ms. Green if that were true. Ms. Green said that she told them it was true, that the officers told her the police did not need a name, and that she signed a refusal to prosecute form. Ms. Green said that she thanked the officers because she did not want to give them the number but knew if she did not, she would have to testify as a witness. Ms. Green stated that when she left the police station, the Defendant called her and asked what happened, that she told him she told the truth, and that he responded, "Well, why? Now I've got to figure out what I've got to tell them when I get to work." Ms. Green said the Defendant told her that he was going to tell the police he gave her the serial number and that he was going to say he told her to check it against her records. Ms. Green stated, though, that the Defendant did not ask her to check the number against her records.

Ms. Green testified that she spoke to investigators about this incident on August 6, 2013, and brought with her telephone records reflecting calls between herself and the Defendant. She said that she marked on the records which calls came from the Defendant and allowed the officers to copy her text messages from the Defendant. The telephone records and a photograph of text messages were received as exhibits. Ms. Green stated that the Defendant sent her three text messages on July 10 and that the last message read, "Hey, my supervisor is calling me about the serial number. Call me ASAP."

On cross-examination, Ms. Green testified that when she discovered the burglary at her house, she called her cousin, her mother, and the Defendant before calling the police. She stated that she arrived home around 4:00 p.m. Ms. Green said that her house had been burglarized three times previously and that she was not afraid for her safety because she did not hear an intruder in the house.

Ms. Green testified that the description she gave of the two men she saw stealing the ladder was not very detailed. Ms. Green stated that when she called the Defendant to tell him she had called the police, the Defendant told her he had seen the same men loitering in the church parking lot earlier in the day. She said the Defendant told her that the men were possibly responsible for the burglary of her house and that he was going to follow them. Ms. Green denied the Defendant told her that he was going to call the police. She said that when the Defendant called her again, he told her that he had arrested two men who had Ms. Green's belongings and that the police would call her to come to the scene later. She said that the Defendant did not mention a serial number initially and that he did not ask if she had a serial number. She said that when he gave her the number, she wrote it on a piece of paper with no intention of using it. She stated that she never gave any serial number for a DVD player to the police. She said that after she told the police someone had called her and had given her a serial number, she showed them the piece of paper. Ms. Green stated that she gave the police three or four serial numbers in connection with the burglary and that all the numbers were written on the same piece of paper.

Ms. Green testified that she arrived at the parking lot and that the DVD player at the scene looked like her DVD player. She stated that Officer Mackey asked her if she was familiar with scratches on the DVD player and that she told him she was not. She said that at the scene, she was unsure whether the DVD player was hers, but that she did not tell Officer Mackey the DVD player was hers. She did not remember telling anyone on July 10 that the DVD player probably was not hers. She remembered a felony response officer's telling her the DVD player probably was not hers.

Ms. Green testified that initially, felony response officers asked her to go home and find any serial numbers she had and that she brought the piece of paper on which she wrote the serial number the Defendant provided. She said that the officers "told [her] the situation" and asked to see the paper and that she gave an officer the paper.

Memphis Police Sergeant Steve Kent testified that he worked for the felony response unit and that on July 10, 2013, he was assigned to Ms. Green's burglary case. He said that when he began investigating, he knew that one man was in custody and "that an off-duty officer had stopped a guy with a piece of stolen property" and was on his way to the police station. Sergeant Kent stated that he was curious about how the off-duty officer knew the item was stolen and "what else was going on there." He said that he

informed M.R.[1] of his *Miranda* rights and interviewed him after M.R. signed a rights waiver. Sergeant Kent stated that M.R. was calm and surprised when Sergeant Kent told him the DVD player was stolen. Sergeant Kent said that M.R. told him the DVD player belonged to him and that his mother bought it for him. Sergeant Kent stated that M.R. said he was going to pawn the DVD player. Sergeant Kent said that he tried to ascertain whether a serial number was available from the burglary, that he spoke with his partner, that his partner contacted the victim, and that his partner told Sergeant Kent the victim had a serial number. Sergeant Kent said that when he told M.R. the police had a serial number, M.R. told him that "the officer told . . . that woman the serial number" and that he saw the officer on his cell phone speaking to someone.

Sergeant Kent testified that he stopped the interview and contacted his supervisor because M.R. accused an officer of wrongdoing. Sergeant Kent said that he spoke to Ms. Green when she gave her initial statement, that she told him she had paperwork proving her ownership of the DVD player, and that she went home and returned to the police station with a piece of paper containing handwritten serial numbers. Sergeant Kent stated that his partner spoke with her further about the DVD player's serial number and that Ms. Green's demeanor changed to "one of relief, I guess that she was finally telling us what was really going on."

Memphis Police Sergeant Lorenzo Young testified that he investigated Ms. Green's case with Sergeant Kent. He said that he interviewed M.R. and Ms. Green and that he spoke with M.R.'s mother. Sergeant Young stated that M.R. was "adamant about that property belonging to him" and that M.R.'s mother confirmed the DVD player belonged to her and told him she could prove her ownership. Sergeant Young said M.R. stated that his mother bought three DVD players and that this DVD player was located in M.R.'s bedroom. Sergeant Young said M.R.'s mother corroborated his story.

Sergeant Young testified that during his first conversation with Ms. Green, he asked her if she had a serial number and that she told him she did. Sergeant Young stated that Ms. Green gave them a piece of paper containing three handwritten serial numbers. He stated that he questioned Ms. Green about the numbers being handwritten and that her demeanor changed. Sergeant Young stated that after Ms. Green "told us what happened," he contacted his supervisor, and the two men were released without having been charged.

M.R.'s mother testified that on July 10, 2013, M.R. was arrested. She said that she bought a DVD player for M. R., which he kept in his bedroom. M.R.'s mother stated that she was told M.R. had been arrested because he broke into a house and had a DVD player. M.R.'s mother said that her husband confirmed M.R.'s DVD player was not in his bedroom. She stated that she told the police the DVD player belonged to her, that she

---

[1] It is the policy of this court to refer to minors by their initials.

did not speak to M.R. on the telephone, and that she did not have a serial number because the DVD player was about ten years old.

M.R. testified that on July 10, 2013, he left home to pawn his DVD player with the help of his friend, M.W., who was age nineteen. M.R. stated that he noticed a black truck following them, that the truck pulled up alongside them, and that the Defendant rolled down the window. M.R. said M.W. asked the Defendant if the Defendant knew them, and the Defendant responded, "Do you all want to get to . . . know me[?]" M.R. stated the Defendant exited the truck with a gun in his hand.

M.R. testified that he and M.W. attempted to walk away from the Defendant and that when the pair reached a parking lot, two police cars pulled up. M.R. said that a uniformed officer told them to sit down, that the officer spoke with the Defendant, that the Defendant took the DVD player, and that M.R. and M.W. were handcuffed and patted down. M.R. stated that the Defendant asked them where they had the "rest of the stuff." M.R. said the officer placed him and M.W. in separate police cars.

M.R. testified that he saw the Defendant talking on a cell phone and looking at the DVD player. M.R. said that after the uniformed police officers arrived, he thought the Defendant was an undercover police officer. M.R. stated that the officers took him to the police station.

M.W. testified that on July 10, 2013, M.R. called him and asked for his help pawning a DVD player. M.W. said that M.R. met him at his house, that M.R. carried the DVD player in a bag, and that they saw a black truck slowly driving down the street and later in a restaurant parking lot. M.W. stated that he told M.R. if the truck were still there when they arrived in the restaurant parking lot, they were going to "see what was going on." M.W. said that he approached the truck with his hands up and asked, "What's up, do you know us or something?" He stated the driver exited the truck holding a gun pointed downward and said, "No, but you can get to know us." M.W. said that M.R. told him to keep walking because the driver had a gun, that the pair continued walking to another parking lot, and that a uniformed police officer pulled up in a police cruiser. M.W. stated that the black truck pulled in behind the police car, that an officer and the driver of the truck exited their vehicles, that the officer told the men to come over to him, that the driver of the truck asked them where the rest of the stuff was, and that the officer searched them and put them in the back of the police car. M.W. said he realized the driver of the truck was a police officer when the uniformed officer arrived in the parking lot.

M.W. testified that he saw the driver of the truck talking on his cell phone near the back of the police car. M.W. stated that he saw the driver of the truck write something down and thought the driver was looking at the DVD player because the driver had opened the bag containing the DVD player. M.W. said that they were transported to the

police station, that he gave a statement, and that the police released them after calling their mothers.

The Defendant testified that in July 2013, he was dating Ms. Green and that they returned from a trip on July 8. He said that she dropped him off at his house, that she later called and told him her house had been burglarized, and that he told her to call the police. The Defendant said Ms. Green told him that the burglars had taken laptops, clothing, jewelry, and televisions. The Defendant stated that he was not involved in the police investigation of the burglary.

The Defendant testified that on July 10 around noon, he and a man began repairing Ms. Green's broken window, that Ms. Green ran outside around 3:00 or 3:30 p.m. and told them she called the police about two black men burglarizing "the house," and that the Defendant saw two men carrying a ladder and a bag running through the woods next to a church. The Defendant stated that Officer Mackey and three other officers responded to Ms. Green's house. The Defendant said that Officer Mackey walked through the wooded area and recovered "the stuff," which he returned to the homeowner. The Defendant stated that he asked Officer Mackey whether he would write a report and that Officer Mackey said he was going to contact his lieutenant. The Defendant said that later that day, Ms. Green told him a DVD player and pieces of her son's clothing were missing.

The Defendant testified that after he left Ms. Green's house around 4:00 p.m., he saw two men fitting the description of the men he saw stealing the ladder. The Defendant said he called Officer Mackey and told him it was possible the men had stolen the items from the church. The Defendant stated the men could have been involved in Ms. Green's burglary. The Defendant said he remained on the phone with Officer Mackey and followed the men. The Defendant stated that M.W. asked him, "What's up?" when M.W. noticed the Defendant following them, that the Defendant exited his truck with his service weapon at his side, that the Defendant reentered his truck, and that the Defendant pulled into the parking lot behind Officer Mackey. The Defendant denied pointing his service weapon at M.W. and saying, "Do you want to get to know me?"

The Defendant testified that he assisted Officer Mackey in patting down the men, that the Defendant's intent was to identify the men as having taken items from the church, and that the men were the men the Defendant saw taking the ladder. The Defendant said he looked inside the bag the men carried to "make sure" the serial number matched Ms. Green's serial number. The Defendant stated that he did not know Ms. Green did not have a serial number in her possession because he did not know her DVD player had been stolen.

The Defendant testified that he called Ms. Green from the parking lot, that Ms. Green told him her black Magnavox DVD player was missing, that Ms. Green had

received the DVD player from her stepmother, and that her stepmother had the serial number at her house. The Defendant said that he gave Ms. Green the serial number from the DVD player because when Officer Mackey spoke to M.R.'s mother on the telephone, she insisted she had the serial number. The Defendant stated that he wanted Ms. Green to compare the serial number he gave her to the serial number her stepmother had and that he thought if the numbers did not match, Ms. Green would not lie about it because the DVD player was only worth thirty dollars. The Defendant said that he wanted to make sure the men were not charged. The Defendant denied telling Ms. Green to lie and say the serial number was hers.

On cross-examination, the Defendant testified that at the parking lot, he did not want the men to be charged because the officers had not filed a theft report related to the theft of the ladder. The Defendant said he stopped the men because of the theft of the ladder and denied stopping them because he wanted the men charged with the burglary of Ms. Green's house. The Defendant stated that he called Ms. Green to ask if a DVD player was stolen in the burglary and that Ms. Green told him the DVD player had been stolen. The Defendant stated that the men who stole the ladder also carried a bag, that the ladder was recovered, and that the bag was not. The Defendant said that when he stopped the men, he did not know what was in their bag and that he was positive they were the men he saw fleeing with the ladder. The Defendant stated that Lieutenant Segrest advised Officer Mackey not to file a report about the theft of the ladder. The Defendant agreed that he was off duty during the incident, that he called Officer Mackey on Officer Mackey's personal cell phone, and that he pulled into the restaurant parking lot because "I guess they noted that I had been trailing them[.]" The Defendant said that he got out of his truck but denied saying anything more than "What's up" to the men. The Defendant denied asking if the men wanted to get to know him and said his gun remained secured in a holster, although his hand was on his gun.

The Defendant testified that at the parking lot, he asked the men where the "rest of the stuff" was located and that the question referred to items taken from the house with the ladder, not Ms. Green's house. The Defendant said Officer Mackey, not he, accessed Ms. Green's burglary report.

The Defendant testified that although Officer Mackey accessed Ms. Green's burglary report, the Defendant did not tell Officer Mackey he suspected the men of committing the burglary. The Defendant said Officer Mackey accessed the report because Ms. Green advised him the DVD player belonged to her and because Officer Mackey had to verify her ownership for Lieutenant Segrest. The Defendant acknowledged the report was accessed at the beginning of Officer Mackey's stopping the men. The Defendant stated that he called Ms. Green for the report number and that she told Officer Mackey a DVD player was missing. The Defendant denied, though, that he suspected the men of committing the burglary. When asked why the Defendant called Ms. Green if he did not suspect the men of burglarizing her house, the Defendant said he

called because the officers did not file a report relative to the theft of the ladder and the officers thought the items possibly belonged to Ms. Green.

The Defendant testified that he told Lieutenant Segrest Ms. Green was a friend who lived in the neighborhood and that he did not disclose their romantic relationship because Lieutenant Segrest did not ask. The Defendant said that his first call to Ms. Green from the parking lot related to the report number, that the second call related to the DVD player missing from her house, and that the third call related to the serial number. The Defendant stated that the third call occurred before Officer Mackey called M.R.'s mother. The Defendant said, though, that during the third call, he told Ms. Green she needed to ensure the serial number matched her DVD player because M.R.'s mother had told the police M.R.'s mother had the serial number.

The Defendant testified that he knew an original or a copy of a serial number was required in order to prosecute a person and said, "You just can't have a handwritten serial number." He said that he advised Ms. Green to verify the number. He stated that in order to arrest the men, the police needed a matching serial number. The Defendant denied knowing a person could be prosecuted with a handwritten serial number. The Defendant said that after the men were taken to the police station, he asked Ms. Green if she had gone to her stepmother's house. The Defendant stated that Ms. Green was "adamant" that the DVD player recovered from the men was hers and that the Defendant told her she needed the serial number in order to get a conviction. The Defendant said that he spoke with Ms. Green once more, that she said she signed a refusal to prosecute and the police released the men, and that she began screaming and crying and hung up the telephone. The Defendant stated that he had not heard from Ms. Green until the day before the trial. On redirect examination, the Defendant denied telling Ms. Green, "Hey, I need to get my story together."

Upon this evidence, the Defendant was convicted of tampering with evidence, three counts of official misconduct that were merged into one conviction, and two counts of official oppression. This appeal followed.

## I.

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. The State responds that the evidence is sufficient.

### a. Evidence Tampering

The Defendant contends that the evidence is insufficient to support his evidence tampering conviction, arguing that neither he nor Ms. Green presented the serial number

to law enforcement and that the evidence did not establish an intent to interfere in the investigation.  He does not contest the other elements of the offense.  The State responds that providing the serial number to Ms. Green with instructions to present it to the police is sufficient evidence to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

 "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-16-503(a) states, in relevant part,

It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . . [m]ake, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

An official proceeding is defined as "any type of administrative, executive, legislative or judicial proceeding that may be conducted before a public servant authorized by law to take statements under oath." *Id*. § 39-11-106(a)(25) (Supp. 2011) (amended 2014).

Tennessee courts have not considered whether Code section 39-16-503(a)(2) requires an individual to present evidence to law enforcement, which is an issue of statutory interpretation.  "The most basic principle of statutory construction is to ascertain and give effect to legislative intent without broadening the statute beyond its intended scope." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citing *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)).  Generally, if the language of a statute is plain in its meaning, we need only apply the statute without examination of other sources. *Id*.  If the language of a statute is ambiguous, however, we may consider the legislative intent underlying the statute, legislative history, and other sources. *Powers v. State*, 343 S.W.3d

36, 44 (Tenn. 2011). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *State v. Strode*, 232 S.W.3d 1 (Tenn. 2007) (internal citations omitted).

The plain language of section 39-16-503(a)(2) does not specify to whom the false evidence need be made, presented, or used. However, the interpretation the Defendant urges us to accept, that an individual must present evidence to law enforcement, is too narrow given the dual applicability of the statute to investigations and official proceedings.

*State v. Forbes*, 918 S.W.2d 431 (Tenn. Crim. App. 1995), is instructive regarding the issue of whether the evidence tampering statute is limited to presenting false evidence to law enforcement. In *Forbes*, even though the conviction was overturned on grounds related to unanimity of the jury verdict, this court concluded sufficient evidence existed to convict a defendant of evidence tampering when the defendant, an attorney, presented a set of falsified calendars to opposing counsel during the discovery process before a civil trial.[2] In the context of jury instructions, this court noted that "it was not necessary that the evidence be 'presented' to the trial judge to constitute the offense." *Id*. at 447. The statute turns on the intent of the person presenting the false evidence, not the person to whom the evidence is presented. As a result, we conclude that presenting false evidence by providing a serial number to a criminal complainant with instructions to give it to law enforcement to confirm ownership of the property sufficiently implicates the policies supporting the evidence tampering statute.

In the light most favorable to the State, the record reflects that the Defendant gave the serial number to Ms. Green knowing it did not correspond to her DVD player, that he told her it was her DVD player's serial number, and that he instructed her to give the number to the police to provide evidence the men's DVD player was her stolen property. Ms. Green testified that the Defendant told her not to tell the police from whom she obtained the number and that he later told her, "[Y]ou need to give them that serial number. These n------ have done something to somebody, and they need to be in jail." The Defendant repeatedly instructed Ms. Green to give the serial number to the police and told her the men could not be charged without it. The Defendant's actions were circumstantial evidence of his intent to influence the burglary investigation. In addition, there was proof that Ms. Green gave the number to law enforcement. Sergeant Young testified that Ms. Green gave him the paper containing the serial number and that she only admitted the number was given to her after he asked why the number was handwritten. A rational jury could have found beyond a reasonable doubt that the

---

[2] It is unclear whether the attorney, who eventually sent a letter to opposing counsel advising him the calendars were prepared as demonstrative exhibits only, knew the calendars were not originals before sharing them.

Defendant presented the serial number to Ms. Green with the intention of influencing the burglary investigation. The Defendant is not entitled to relief on this basis.

### b. Official Misconduct

The Defendant contends that the evidence is insufficient to support his three official misconduct convictions, arguing that (1) relative to Count 2, the Defendant's actions were not an exercise of official power, (2) relative to Count 3, the Defendant's actions were not under color of office or employment, and (3) relative to Count 4, the Defendant did not violate a law relating to his office or employment. The Defendant does not contest any other issues related to the sufficiency of these convictions. The State responds that the evidence is sufficient.

Tennessee Code Annotated section 39-16-402(a) defines official misconduct, in relevant part, as follows:

> A public servant commits [official misconduct] who, with intent to obtain a benefit or to harm another, intentionally or knowingly . . . [c]ommits an act relating to the public servant's office or employment that constitutes an unauthorized exercise of official power . . . [c]ommits an act under color of office or employment that exceeds the public servant's official power . . . [or] [v]iolates a law relating to the public servant's office or employment[.]

*Id*. at §39-16-402(a)(1), (2), and (4). A public servant includes employees and officers of government. *Id*. § 39-16-401(3)(A).

The jury instructions in this case defined "under color of office or employment" as acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity. The indictment relative to Count 2, official misconduct, alleged that the Defendant, "a Police Officer . . . with the intent to obtain a benefit or harm another, did commit an act relating to his employment that constitutes an unauthorized exercise of official power[.]" Relative to Count 3, official misconduct, the indictment read that the Defendant committed "an act under color of office or employment that exceeded his official power[.]" Relative to Count 4, official misconduct, the indictment read that the Defendant committed an act "that violates a law relating to his office or employment[.]" During closing arguments, the prosecutor stated that in Counts 2 and 3, the charges stemmed from the Defendant's calling Officer Mackey, and in Count 4, the charge stemmed from the Defendant's tampering with evidence.

Relative to Counts 2 and 3, Officer Mackey testified that the Defendant called his cell phone and told Officer Mackey he was following two men with "possibly stolen items" and that the Defendant thought the men were involved in the theft of the ladder and possibly the burglary of Ms. Green's home. The Defendant agreed that he called

Officer Mackey's personal cell phone. Ms. Green testified that M.R. and M.W. did not look like the men she saw stealing a ladder, specifically that one man's hairstyle was unlike that of either man who stole the ladder. Ms. Green said that after the men were arrested, the Defendant told her that the men had "done something to somebody" and should be in jail.

A rational jury could have found beyond a reasonable doubt that the Defendant took advantage of his status as a police officer to contact his fellow officer, Officer Mackey, by identifying the men as the individuals who took the ladder and telling him that the men had possession of stolen items with the expectation that Officer Mackey would respond and stop the men in order to investigate. We note that that the Defendant did not have probable cause or reasonable suspicion to stop the men, rendering the Defendant's instigating the stop through Officer Mackey an action relating to his employment as a police officer that exceeded his official power. The Defendant is not entitled to relief on this basis.

Relative to Count 4, Officer Mackey, M.R., and M.W. testified that they saw the Defendant examining the DVD player and speaking to someone on the telephone. As a police officer, the Defendant had access to the seized DVD player at the scene. Ms. Green testified that the Defendant instructed her to write down a serial number as being that of her DVD player and to give the number to the police. Ms. Green said that the Defendant told her not to tell the police from whom she obtained the number. When she initially did not give the serial number to the police, the Defendant told her that the men could not be convicted without the number and that the men needed to be in jail because they had "done something to somebody." A rational jury could have found beyond a reasonable doubt that the Defendant tampered with evidence, which was related to his employment as a police officer because he instigated the arrest of the men when he presented Ms. Green with the serial number prior to her viewing the DVD player and instructed her to claim the DVD player was her property. The Defendant is not entitled to relief on this basis.

### c. Official Oppression

The Defendant contends that the evidence is insufficient to support his two official oppression convictions, arguing that he did not act under color of employment because he did not stop M.R. and M.W. or arrest them. The State responds that the evidence is sufficient.

Tennessee Code Annotated section 39-16-403(a)(1) defines official oppression, in relevant part, as follows: "A public servant acting under color of office or employment . . . [who] [i]ntentionally subjects another to . . . arrest, detention, stop, frisk, halt, search, [or] seizure . . . when the public servant knows the conduct is unlawful[.]" The jury

-16-

instructions defined "under color of office or employment" as acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity.

In the light most favorable to the State, the record reflects that the Defendant, Officer Mackey's coworker, called Officer Mackey's personal cell phone and told Officer Mackey he was following two men he suspected were involved in a theft and possibly a burglary. The Defendant did not communicate that he observed any suspicious behavior other than saying without explanation that the men carried "possibly stolen" items and identifying the men as the ones who stole the ladder. Officer Mackey stopped the men, and the Defendant testified that he helped Officer Mackey frisk one of them. While the Defendant maintained that the men were the same men he saw stealing the ladder, the jury, by its verdict, discredited the Defendant's testimony. Ms. Green testified that the men were not the men she saw steal the ladder.

The Defendant instigated Officer Mackey's stopping the men with the telephone call. A rational jury could have found beyond a reasonable doubt that the Defendant took advantage of his capacity as a police officer to contact a fellow officer and summon him to the Defendant's location in order to stop M.R. and M.W. by stating they possibly carried stolen items and were involved in the theft of the ladder. We note that information provided by another police officer is one circumstance our courts have considered when determining whether a stop was supported by reasonable suspicion. *See, e.g., State v. Watkins*, 827 S.W.2d 293 (Tenn. 1992) ("In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances . . . . [including] information obtained from other police officers or agencies[.]") (citing *United States v. Cortez*, 449 U.S. 411, 47-18 (1981)). We also note that when reviewing an arrest for the existence of probable cause, courts may consider "the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer . . . . Such a nexus exists when . . . one officer directs another officer to act." *State v Bishop*, 431 S.W.3d 22 (Tenn. 2014) (citing *State v. Echols*, 382 S.W.3d266, 278 (Tenn. 2012)); *see State v. Ash*, 12 S.W.3d 800, 805-06 (Adopting the "police team" doctrine in which an act taking place in the presence of one officer is, in legal effect, taking place in the presence of cooperating officers). The evidence is sufficient. The Defendant is not entitled to relief on this basis.

## II.

### Indictment

The Defendant contends for the first time on appeal that the indictment for Count 3, official misconduct, is defective and requests plain error review. He argues that the indictment, which stated the Defendant committed "an act that violated the law related to

his employment" should have specified the law violated. The State responds that the indictment is not defective.

Five factors are relevant

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Our federal and state constitutions require a criminal defendant be provided information of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Generally, an indictment is valid if it contains adequate information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997) (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Furthermore, Tennessee Code Annotated section 40-13-202 requires an indictment to "state the facts constituting the offense in ordinary and concise language . . . in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202 (2014). "It is generally sufficient for the indictment to state the offense charged in the words of the statute." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010) (citing *State v. Griffis*, 964 S.W.2d 577, 591 (Tenn.Crim.App.1997)).

In support of his contention that he received insufficient notice, the Defendant cites *State v. Angela Ayers*, No. W2014-00781-CCA-R3-CD, 2015 WL 4366633 (Tenn. Crim. App. Jul. 16, 2015), *perm. app. filed* (Tenn. Sept. 15, 2015). In *Angela Ayers*, this court held that an indictment for employing a firearm during the commission of a dangerous felony did not provide sufficient notice where the indictment did not identify the predicate dangerous felony and no dangerous felony was charged in the remaining

-18-

counts of the indictment.[3] The Defendant's reliance on *Angela Ayers* and similar cases is misplaced. Dangerous felonies are a statutorily designated category of crimes enumerated in Code section 39-17-1324(i)(1). The risk of confusion to defendants stems from the existence of the list of dangerous felonies, any of which could be the basis for a violation of Code section 39-17-1324.

Conversely, Code section 39-16-402(a)(4) states that a public servant must have violated "a law relating to the public servant's office or employment." Unlike *Angela Ayers*, the indictment in the present case did not reference a statutory list of offenses for which the Defendant had not been charged. The official misconduct charge could have been based on evidence tampering or official oppression, both of which were charged in the indictment and were violations of law relating to the Defendant's employment as a police officer. As a result, we conclude that the Defendant was provided adequate notice relative to the possible theories of prosecution against which he had to prepare a defense in Count 3, official misconduct.

We note that similar language in Code section 39-16-402(a)(1) has been upheld by this court as providing constitutionally adequate notice. *See State v. Matthew Carfi*, No. M2005-01467-CCA-R3-CD, 2006 WL 2788523, at *19 (Tenn. Crim. App. Sept. 29, 2006) (concluding that the language "an act relating to the servant's office or employment" in the context of the official misconduct statute gave adequate notice of the proscribed conduct), *perm. app. denied* (Tenn. Mar. 5, 2007); *see also State v. John Paul Szczepanowski*, No. E2000-03124-CCA-R3-CD, 2002 WL 1358681 (Tenn. Crim. App. Jun. 24, 2002), *perm. app. denied* (Tenn. Dec. 2, 2002).

Because Count 3 of the indictment tracked the language of Code section 39-16-402(a)(2), it was sufficient. We note that the Defendant did not request a bill of particulars in this case and that the prosecution elected the factual basis for the violation of law during closing arguments. The Defendant has not established a clear and unequivocal breach of law. The Defendant is not entitled to relief on this basis.

### III.

### Denial of Diversion

The Defendant contends that the trial court erred in denying him judicial diversion, arguing without reference to the record that "the trial court abused its discretion in denying him judicial diversion. The factors, as enumerated above, mitigate

---

[3] The defendant in *Angela Ayers* was charged with first degree premeditated murder, which is not an enumerated dangerous felony, but was convicted of the lesser-included offense voluntary manslaughter, which was used as the dangerous felony to support the firearm conviction.

in his favor." *See* T.R.A.P. 27(g). The State responds that the trial court did not abuse its discretion.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2013) (amended 2014). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent case law affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984)

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

At the sentencing hearing, Memphis Police Lieutenant Antoinette Giles testified that the Defendant was chosen by the police director to work with a community outreach program due to the Defendant's compassion, patience, and desire to work in the community to combat juvenile violence and that Lieutenant Giles was the Defendant's supervisor in 2011 or 2012. Lieutenant Giles said that the Defendant was "one of the more mature officers" and that she relied heavily upon him. She stated that the Defendant created a process by which the officers could survey the community about juvenile violence. She said that the Defendant organized a number of events to engage local youth, that the Defendant had personal contact with children in the neighborhood,

and that some children came to him for help. She stated that the Defendant worked with children through the program while on duty and on his free time to keep them from becoming delinquent. She said that the Defendant volunteered at a home for senior citizens and that the Defendant volunteered his vehicle to transport food for the needy.

Lieutenant Giles testified that the Defendant was an outstanding officer with whom she enjoyed working and that she had nothing bad to say about him. She said she thought he would be a good candidate for diversion or probation.

On cross-examination, Lieutenant Giles testified that she did not know the facts underlying the Defendant's convictions. When asked whether the Defendant's actions underlying the convictions were indicative of a good police officer, Lieutenant Giles said she would need more information about the situation and did not feel comfortable giving an opinion based on "hypotheticals." She said, though, that as a twenty-eight-year veteran of the police department, she did not stop people without probable cause and did not tell people to lie to the police.

On redirect examination, Lieutenant Giles testified that the actions described by the prosecutor were inconsistent with her knowledge of the Defendant's character and that she would still recommend the Defendant as a good candidate for diversion or probation.

Upon examination by the trial court, Lieutenant Giles said that if the men had been unjustly convicted, it would have been wrong and that in the past, she had proven people innocent during the course of an investigation. When asked how she reconciled the Defendant's actions and the possible harm that could have come to the men, she stated that she "would have had to have been there to assess the situation in order to come to a conclusion" and that she could only comment on her personal experience with the Defendant.

Memphis Police Officer Chris Price testified that he met the Defendant when the Defendant was a "rookie" officer, that the Defendant's determination made them close friends, and that the Defendant encouraged Officer Price when Officer Price's mother was ill. Officer Price said the Defendant's mother died when the Defendant was young, that the Defendant's brother raised him, and that the Defendant was an honorable person. Officer Price stated that the Defendant's stopping someone he suspected of committing a crime was "something any of us would do" and that the Defendant's telling Ms. Green to lie did not make sense. Officer Price said he did not believe the Defendant would commit the crimes for which he was convicted. Officer Price stated that the Defendant was a good father to his two daughters and that the Defendant would be a good candidate for diversion and probation. On cross-examination, Officer Price said that he attended part of the trial but did not hear the Defendant's testimony.

Memphis Police Officer Louis Brown testified that he had worked with the Defendant for twelve years, that the Defendant's character was "great," that other police officers and people in the community looked up to him, that he was a good father, and that he worked to "uplift the community" and was involved in a community outreach program for juveniles. Officer Brown said that the behavior for which the Defendant was convicted was out of character. Officer Brown said that the Defendant would be a good candidate for diversion.

On cross-examination, Officer Brown testified that he did not believe the Defendant was guilty, that the jury was wrong, that Officer Brown attended the trial, and that he believed the Defendant's version of events. Officer Brown said that the Defendant followed his training by calling the police.

Memphis Police Officer Gregory Robinson testified that he attended the police academy with the Defendant, that he and the Defendant were partners for ten years, and that in 2006 or 2007, the Defendant saved his life during a bank robbery call by interrupting an altercation between Officer Robinson and a suspect in which the suspect almost overpowered and attempted to shoot Officer Robinson. Officer Robinson said he could rely on the Defendant for anything and that the Defendant was dependable and honest. Officer Robinson stated that the Defendant worked with a youth outreach program, a boxing program for juveniles, and "all kind[s] of stuff with the community centers." Officer Robinson said that the Defendant would be a good candidate for diversion. On cross-examination, Officer Robinson stated that he did not believe the Defendant was guilty.

Suzette Quarrels, a former coworker of the Defendant's, testified that the Defendant was "very fond of the youth" in the apartment community for which the Defendant worked as a security officer, that the Defendant worked with and mentored children, and that she knew the Defendant to be a law-abiding citizen. She said that the conduct underlying the Defendant's convictions was inconsistent with her experience with him. She stated that the Defendant was a good candidate for diversion. On cross-examination, Ms. Quarrels said that she did not believe the Defendant was guilty and that she did not attend the trial.

Ashley Butler, the Defendant's daughter, testified that the Defendant was a strong, supportive father, that although her parents were divorced, they provided a "great support system," and that she did not know what she would do without the Defendant. She said that she depended on the Defendant for moral and financial support and that they loved each other. Ms. Butler asked the court for leniency.

The Defendant testified that he had no reason to frame the men for the burglary. He said that his mother died when he was eight years old, that members of his family supported him, that he worked in corrections for a number of years after college, and that

he began working as a police officer. He stated that he did not feel he was guilty of the charges, that his daughter relied on him, and that he had since started his own business to support her.

The Defendant's presentence report was received as an exhibit. The report reflected that the Defendant was forty-eight years old, that he had a college degree, that he had good mental and physical health, that he reported no drug use, and that the Defendant had opened a lawn care business in January 2014. The report reflected no previous convictions.

M.W. submitted a victim impact statement and requested the maximum sentence for the "slander," intimidation, and "abuse" to which the Defendant subjected him.

The trial court noted that it believed the Defendant had committed perjury in his trial testimony and that the Defendant's conduct would have supported charges for suborning perjury, aiding and abetting, and false reporting. The court found relative to the Defendant's status as a qualified defendant under Tennessee Code Annotated Section 40-35-313, the Defendant was arguably an appointed person in the executive branch who used his official capacity to commit the offenses, under which circumstances the Defendant would not have been eligible for diversion.[4] However, the court proceeded to consider the *Electroplating* factors.

The trial court found that relative to the Defendant's amenability to correction, the Defendant had "led an exemplary life" and had benefited the community, although "I don't think the two young men . . . nor their parents, nor the young lady that . . . he put up to giving this false information . . . [would] think so." The court found relative to the circumstances of the offense that the offense was "a reprehensible and wicked act," that the Defendant, a police officer, tried to frame the men who "obviously didn't do anything wrong," that the Defendant may have been acting on a "hunch" that turned out to be incorrect, that the men were "very lucky that [the Defendant] was so brazen," and that this factor weighed greatly against diversion. The court found relative to the Defendant's criminal record that he had no prior record and that this factor weighed in the Defendant's favor. The court found that the Defendant's social history, physical health, and mental health weighed in the Defendant's favor.

---

[4] A qualified defendant, in relevant part, is defined as a defendant who

(b) Is not seeking deferral of further proceedings for any offense committed by any elected or appointed person in the executive, legislative or judicial branch of the state or any political subdivision of the state, which offense was committed in the person's official capacity or involved the duties of the person's office;

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i) (Supp. 2012) (amended 2014, 2015).

The trial court noted the presence of individuals who had come to the hearing in support of the Defendant and said that "if you sat through this, and you saw his testimony, you would know that [the Defendant] is guilty of this offense. There's just no way around it." The court stated that the Defendant might have been better off pleading guilty and "throwing himself at the mercy of the court." The court noted that its belief the Defendant lied under oath was enough to deny diversion.

Relative to the deterrent value to other police officers, the trial court found that the Defendant perpetuated a negative stereotype about police officers by his conduct and that giving him judicial diversion when regular citizens "would go straight to jail" would not deter similarly situated individuals. Relative to the public interest, the court found that the offenses were "appalling" and that diversion was not in the public interest. The court found that the factors weighed against diversion and denied it.

The record reflects that the trial court considered the *Electroplating* factors, explained its reasoning and the weight it gave each factor, and articulated its reasoning for denying judicial diversion. Therefore, we review the court's denial of diversion with a presumption of reasonableness. The court placed great weight on the circumstances of the offense, the court's finding the Defendant provided untruthful testimony, and the need to deter similarly situated individuals. The court acknowledged the Defendant's lack of a criminal record and work in the community but found those favorable factors were outweighed by the "appalling" circumstances of the offense. The trial court did not abuse its discretion by denying diversion. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE